THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOHNNY GAUTIER, Appellant.

First Department, July 27, 1989

### APPEARANCES OF COUNSEL

*Stacey K. Edelbaum* of counsel *(Susan L. Valle* with her on the brief; *Paul T. Gentile,* attorney), for respondent.

*Frank J. Pugliese* of counsel *(David H. Fromm,* attorney), for appellant.

### OPINION OF THE COURT

MURPHY, P. J.

The defendant has been convicted, after a jury trial, of two counts of rape in the first degree (Penal Law § 130.35 [1]), two counts of rape in the third degree (Penal Law § 130.25 [2]), and one count of sexual abuse in the first degree (Penal Law § 130.65 [1]). At the trial, the People introduced testimony in their case-in-chief to the effect that the defendant had either raped or otherwise sexually abused the complainants, his daughters, both before and after the offenses charged in the

indictment, which offenses were alleged to have occurred sometime in November 1983. As we are of the view that this testimony as to uncharged offenses was improperly admitted and highly prejudicial, we believe that the judgment of conviction should be reversed and the matter remanded for a new trial.

Although the indictment only charged the defendant with offenses said to have been committed in November 1983, the evidence purported to show that the defendant had, for years prior to November 1983, and for months thereafter, sexually abused his daughters. The trial assistant stated in her opening, "November wasn't the first time for these two girls * * * the evidence will show [that] he abuse[d] these girls for a period of years". The trial assistant went on to elicit the following testimony from the first of the complainants to take the stand who was 12 years of age at the time of the trial which took place in February 1985:

"Q Was that the first time your father touched you in the vagina?

"A No.

"Q Do you remember when the first time was?

"A First time when I was small, like seven to eight.

"Q And when you were seven or eight years, old what did he do?

"A He used to touch me.

"Q Yaninth did he ever touch you with anything besides his hands?

"A Yes."

On at least one subsequent occasion similar testimony was elicited from the same witness.

The second of the complaining witnesses, also 12 years of age at the time of the trial, responded to the trial assistant's inquiries as follows:

"Q Yvette, would you please tell us what happened?

"A That he put his penis inside of where I pee.

"Q How many times did he do that?

"A Many times.

"Q How old were you when he did it the first time?

"A Seven."

The witness went on to state in response to the trial assistant's questions that this had last happened in 1984.

The defendant's 11-year-old son who slept in the same room as his sisters also testified. During his testimony this exchange took place:

"Q Did you ever see anything happen between your father and Yvette after November of '83?

"MR. LAZARUS [defendant's attorney]: Objection.

THE COURT: After November of '83? Objection sustained.

"A He tried it once more.

"THE COURT: Objection sustained.

"Q Ruben, I'd like you to think back. In August of 1984, did you see anything happen between your father and Yvette?"

Although an objection to this last question was eventually sustained and a limiting instruction given, the import of the foregoing testimony would not have been lost upon the jury.

In her summation, the trial assistant referred in the most graphic terms to the testimony concerning the defendant's prior uncharged transgressions. She told the jury, "its going to be up to you to decide whether these kids were telling you the truth; whether, as Ruben told you, this Defendant, forty-four years old, in the middle of the night in November of 1983, AS HE HAD DONE ON PREVIOUS OCCASIONS, took his clothes off, went to his daughters' beds and laid on top of them, and put his penis into their twelve year old bodies." (Emphasis supplied.)

Although the court did belatedly realize that there was no legitimate purpose to be served by the evidence of uncharged crimes post-November 1983, and, therefore, instructed the jury that "[N]othing occurred between the defendant and anybody else in August", the same was not true of the testimony relating to the pre-November 1983 bad acts. The latter testimony was permitted by the court to show the defendant's "amorous designs" upon his daughters. Indeed, on two occasions the court expressly instructed the jury that the subject testimony was admitted only to show amorous design. And, the court in its charge to the jury stated, "[N]ow you also heard, during this trial, testimony that on occasions prior to November of 1983, this defendant, it is alleged, engaged in other uncharged sexual acts with the alleged victims. As I previously instructed you, and I tell you again, *the evidence was admitted solely for the purpose of showing amorous design.* If you credit it on the part of the Defendant toward the alleged victims, even if you believe that such prior acts did occur, this does not mean that you should convict the Defen-

dant of the crimes actually charged in the indictment which have to do with the month of November of 1983. *That is, you may consider the evidence of prior sexual acts as bearing on the Defendant's amorous design with respect to any crime charged in the indictment"* (emphasis supplied).

It is, of course, the long-standing rule that evidence of uncharged crimes is not admissible solely to show a defendant's general predisposition to criminal conduct. *(People v Molineux,* 168 NY 264, 291-293.) Evidence of crimes other than those charged is, however, admitted when it can be shown relevant in a specific way to the proof of some element of the crime under consideration, and when the prejudice caused the defendant by its admission will not exceed its probative value. *(People v Alvino,* 71 NY2d 233, 242.) It is true that one circumstance in which evidence of uncharged crimes has been permitted is that in which it is relevant to establish the existence of an "amorous design". But, as has been made clear, proof of "amorous design" has relevance only in a very narrowly drawn category of cases. Where the illicit sexual activity is consensual and the proof of its occurrence is circumstantial and ambiguous it has been thought proper for the prosecution to show that the parties to the alleged crime were mutually attracted or, in other words, that there was between them an "amorous design." *(People v Lewis,* 69 NY2d 321, 325-327.) "The testimony is admissible not to establish the defendant's attitude toward his victim but to establish the attitude of codefendants toward each other." *(Supra,* at 327.)

As the People acknowledge, the defendant has not been charged with conduct to which his pre-teen-age daughters could have consented *(see,* Penal Law § 130.05 [3] [a]). Indeed, the defendant was charged with and convicted of forcible rape, and the People pointedly elicited testimony from the complainants that they "did not want this [the sexual contact with the defendant] to happen." Thus, there can be no claim that the evidence of prior uncharged crimes was admitted to show the existence of a mutual disposition to engage in illicit sexual intimacy. Rather, as was made plain by the court's instruction to the jury, the evidence of uncharged crimes was admitted to show the defendant's attitude toward his alleged victims. But, after *Lewis (supra)* it is clear that this is not what is properly meant by "amorous design", and that such evidence of the defendant's predisposition is precisely the sort of evidence which ordinarily has no place in the prosecution's case. If there *is any* doubt in this regard, it ought to be settled

by the Court of Appeals recent decision in *People v Hudy* (73 NY2d 40) where Judge Titone writing for the majority stated, "we recently held in *People v Lewis (supra)* that evidence of prior sexual contact with the same 'victim,' traditionally admitted under the rubric of 'amorous design,' was really no more than a form of propensity evidence hiding behind an assumed name and should no longer be permitted." *(People v Hudy, supra,* at 55.)

Although the jury was repeatedly instructed that the testimony in question was relevant only to show amorous design, a purpose for which it is now apparent that it could not be properly admitted, and the prosecution did not at trial seek to establish a more specific relevance for the testimony, the People now urge that the testimony was introduced to establish the element of force in first degree rape and to show the defendant's lascivious intent. Assuming that these most recent explanations of evidentiary relevance may still be entertained, it is clear that they are entirely without merit.

The circumstances in which evidence of uncharged crimes is considered probative of more than a general predisposition to criminal conduct—in which it may be viewed as bearing directly upon the proof of some element of the crime charged —have been carefully, if not exhaustively, delineated. In *People v Molineux (supra),* the Court of Appeals described five categories of cases in which evidence of crimes other than those charged could be considered competent as proof of the crime at issue. One of these categories dealt with the use of uncharged crimes to prove intent. The theory of evidentiary relevance upon which this category rests derives from the circumstance that there are acts which, when viewed in isolation, may seem innocently performed. When such an act is viewed in context, however, and shown to be one in a succession of such acts, the hypothesis that the act was innocently intended may seem less viable. It is then to negate the existence of an innocent state of mind that proof of other crimes may be admitted. *(People v Molineux, supra,* at 297-298; *People v Schwartzman,* 24 NY2d 241, 247-249; *Matter of Brandon,* 55 NY2d 206, 211-212; *see also,* Richardson, Evidence §§ 172-176 [Prince 10th ed].) Of course, when criminal intent is clearly inferable from the overt act and there exists no viable claim that the act was innocently performed, the rationale for admitting evidence of other crimes in the People's direct case disappears; where no innocent state of mind may be supposed, none need be negated.

It is clear from *Molineux (supra)* that intent is not ordinarily to be inferred from evidence of other crimes properly demonstrative of no more than propensity. The inference of intent from evidence indicative of propensity, it is true, is one often made with seeming validity in everyday experience, but, perhaps for that reason, it may seem to prove too much, and is to be avoided where possible in a criminal prosecution. *(See,* 1A Wigmore, Evidence § 58.2, at 1212 [Tillers rev 1983].) In this regard *Molineux* cautions "it is * * * to be borne in mind that the practice of receiving evidence of other offenses, to prove intent * * * is a departure from the usual rules of criminal evidence, justified and necessitated by the peculiar nature of these crimes [in proof of which such evidence may be utilized.]" *(Supra,* 168 NY, at 299.) And, more recently, in *People v Alvino,* the Court of Appeals has reiterated that "[e]vidence of prior criminal acts to prove intent will often be unnecessary, and therefore should be precluded even though marginally relevant, where intent may be easily inferred from the commission of the act itself" *(supra,* 71 NY2d, at 242; *see also, People v McKinney,* 24 NY2d 180, 184-185).

■ Here, the 12-year-old complainants testified that the 44-year-old defendant entered their beds, lay upon them, touched them in ways that could not have been innocently meant, and, ultimately, had intercourse with them. To say that this was conduct from which the defendant's culpability was to be readily inferred is nothing if not an understatement. Indeed, the defendant made no attempt to characterize the alleged conduct as innocent, he simply denied that there had been any contact between him and his daughters on the occasions charged. In these circumstances, where the conduct described by the complainants was not the least bit equivocal, and where there was no issue raised or even conceivable as to the defendant's intent—the only real issue being whether the defendant had, in fact, performed the acts to which his children testified—there was no legitimate purpose to be served by the introduction of evidence of uncharged crimes. *(See, Matter of Brandon, supra,* at 211; *People v Crandall,* 67 NY2d 111, 118; *People v Bagarozy,* 132 AD2d 225, 236.) Quite plainly, the crimes for which the defendant stood trial did not fall within the "distinct classes in which the intent is not to be inferred from the commission of the act and in which proof of intent is often unobtainable except by evidence of successive repetitions of the act." *(People v Molineux, supra,* at 298.)

There was then no basis for the admission of the evidence in question to establish the defendant's intent.

Similarly, neither would the testimony in question have been admissible to establish the defendant's use of force. This was not a case in which it was necessary to demonstrate that the rape victim's apparent or alleged acquiescence on the occasion of the rape charged was the result of previous abuse and intimidation. The complainants' account of what had transpired indicated that force had been used and that they had not in any way consented to or acquiesced in what the defendant is said to have done to them. Moreover, the defendant made no claim, nor could he have, that his victims had consented to his advances. As was noted in *Lewis*, "evidence of uncharged crimes [is] not relevant in a prosecution for both forcible and statutory rape in which the defendants [have] not contended that the victims * * * consented to intercourse." *(Supra,* 69 NY2d, at 327; *see also, People v Tas,* 51 NY2d 915 [evidence of uncharged crimes to establish force in the commission of first degree sodomy admissible only after the defendant claimed the acts charged to have been consensual].) It may be noted also that even if the uncharged crimes evidence had been admissible to prove the defendant's use of force, its admission would still have required limiting instructions of a sort never given in this case *(see, People v Johnson,* 37 AD2d 218, 221, *affd* 30 NY2d 776); it was, of course, never contemplated at trial that the evidence would be received for the purpose now advanced.

Finally, although the People urge that the disputed evidence was not objected to in timely fashion, the record shows that there were numerous objections to the testimony concerning uncharged crimes and these errors eventually became the basis for a mistrial motion. In any case, the court clearly understood that admitting evidence of offenses other than those charged was problematic and for that reason, *sua sponte,* gave several limiting instructions, the first of which was dispensed very early in the trial. Undoubtedly, if the able trial court had had the benefit of the Court of Appeals subsequent decision in *Lewis (supra)* elucidating the very limited circumstances in which evidence of uncharged offenses is admissible to show amorous design, it would not have erred as it did. The error, however, which cannot under the circumstances of this case be deemed harmless *(compare, People v Lewis, supra* [testimony as to uncharged sex offenses deemed sufficiently prejudicial to require reversal despite the inculpa-

tory testimony of the victim corroborated by the admissions of the defendant made to the victim's aunt]; *People v Hudy, supra* [testimony as to uncharged sex offenses held to require reversal despite consistent inculpatory testimony by eight witnesses to the crimes charged]) is not thereby diminished or less in need of correction upon appeal. *(People v Clark,* 142 AD2d 976, 977.)

Accordingly, the judgment of the Supreme Court, Bronx County (Lawrence Bernstein, J.), rendered February 27, 1985, convicting the defendant, after a jury trial, of two counts of rape in the first degree, two counts of rape in the third degree and sexual abuse in the third degree, and sentencing the defendant to an indeterminate prison term of 7 to 25 years on each of the first degree rape counts, and 2⅓ to 7 years on each of the remaining counts, all to run concurrently, should be reversed, on the law, and the matter remanded for a new trial.

KUPFERMAN, J. (concurring). I concur on constraint of *People v Hudy* (73 NY2d 40, 54).

ROSS, ELLERIN and WALLACH, JJ., concur with MURPHY, P. J.; KUPFERMAN, J., concurs in a separate opinion.

Judgment, Supreme Court, Bronx County, rendered on February 27, 1985, unanimously reversed, on the law, and the matter remanded for a new trial.