■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ULYSSES BOYD, Appellant.—Judgment, Supreme Court, New York County (Thomas B. Galligan, J.), rendered June 23, 1987, convicting defendant, after jury trial, of murder in the second degree (Penal Law § 125.25 [1]) and criminal possession of a

weapon in the second and third degrees (Penal Law §§ 265.03, 265.02 [4]) and sentencing him, as a persistent violent felony offender, to concurrent terms of imprisonment of 25 years to life on the murder count and 10 years to life on the third degree possession count, to run consecutive to a sentence of 25 years to life imposed upon the separate conviction for criminal possession of a weapon in the second degree, unanimously affirmed.

Defendant, Larry Mobley and Derrick Harris were jointly tried for the April 28, 1986 gang-style execution of Harold Bates. Defendant and Mobley were convicted of various charges and Harris was acquitted of all charges.

The crime occurred in the basement of a private residence. The son of the owners, against his parents' wishes, often smoked "crack" cocaine in the basement with his friends. Several of these friends sold drugs to support their habit. On the evening of April 27, 1986, defendant and Mobley arrived with the son. At that time several of the witnesses to the subsequent homicide were in the basement. Among them was Millicent Moore, who testified that the defendant identified himself to her as "Billy Bang" and claimed that he was affiliated with the Vigilantes and P.C. Crew gangs. Boyd also told Moore that they were taking over the basement to sell crack. Moore testified that Boyd bragged to her that "when a nigger got in their way, they would knock him off * * * you kill a nigger in a minute." Joseph Sealy, another witness, testified that Boyd was, in fact, the leader of the P.C. Crew.

Among other witnesses in the basement were Miguel Acosta and the victim Harold Bates. The witnesses generally testified that over the course of the night Boyd sold crack out of the basement to between 50 and 100 customers. Boyd evinced his intention to monopolize the "crack" trade out of the basement.

Some time later, Acosta began cooking "crack". Boyd ordered everybody out, but Acosta insisted that he wanted to finish cooking the "crack". Boyd and Acosta became involved in an altercation. Bates had been asleep at this point. Upon waking, he got up and moved towards his friend Acosta. Mobley hit Bates repeatedly, knocking him down. Mobley, Boyd and Harris drew guns. Mobley displayed an Uzi, loaded it and pointed it at Acosta and Bates. Mobley hit Bates with his gun. Boyd beat Bates' head with his gun and then with a brick, despite Bates' pleas to let him go. Boyd then said, "Bust him". As the defendant instructed, Harris shot Bates in the back several times with a .357 magnum revolver as Mobley

trained his gun on the other occupants of the basement. Police were summoned immediately and the defendant and Mobley were apprehended shortly thereafter.

At trial, Acosta testified that three weeks after the killing, he was approached, offered money and warned not to testify. Acosta was then placed in protective custody. On November 10, 1986, Moore was shot in the head, in connection with her testifying, but survived. Moore was then placed in protective custody. Several other witnesses entered into cooperation agreements with the District Attorney and received housing and relocation. Pursuant to a protective order, the identities and addresses of these witnesses were not disclosed until the eve of their testimony.

Viewing the evidence in a light most favorable to the People *(People v Allah,* 71 NY2d 830), we conclude that the evidence was legally sufficient to support defendant's conviction of intentional murder on a theory of accomplice liability. (Penal Law § 20.00.) It is well established that "[i]t is not necessary to prove that the defendant fired the fatal shot if the evidence is sufficient to establish that the defendant was acting in concert with another who did fire the fatal shot and that the defendant was acting with the mental culpability required for the commission of the crime" *(People v Brathwaite,* 63 NY2d 839, 842 [1984]). The evidence in this case makes it clear that the defendant not only participated in the beating of Bates but ordered the killing.

With respect to the protective order, we conclude that it was proper to prevent disclosure of the witnesses' names and addresses until just prior to their testimony. *(People v Andre W.,* 44 NY2d 179, 185-186; *People v Presto,* 131 AD2d 707.) When a witness is in danger of being intimidated or harmed, the court in the exercise of sound discretion may delay discovery of a witness's name and address until trial, or even conceal a witness's identity during trial. (CPL 240.50 [1]; *People v Remgifo,* 150 AD2d 736 [2d Dept 1989]; *People v Rhodes,* 154 AD2d 279 [1st Dept 1989], *lv denied* 75 NY2d 816 [1990].) In his offer of proof, the Assistant District Attorney presented to the court evidence of intimidation of witnesses and of Vigilantes' assassination contracts including a specific instance in which a witness in another murder prosecution was executed by the Vigilantes after his identity had been revealed. Thus, it cannot be said that the trial court abused its discretion. Nor is there any infirmity in the court holding a further in camera hearing, on the record and without the defendant or counsel, during which the People provided the

court with Grand Jury transcripts and other evidence linking the defendant with the shooting of Millicent Moore and with the killing of the witness in an earlier case. *(People v Andre W.,* 44 NY2d, *supra,* at 185.)

Under the circumstances of this case and considering the overwhelming evidence of defendant's guilt, we conclude that the trial court did not abuse its discretion in permitting evidence of defendant's gang memberships. This evidence was probative of other matters in issue and its probative value outweighed its potential for undue prejudice. *(People v Alvino,* 71 NY2d 233, 241-242 [1987]; *People v Gautier,* 148 AD2d 280, 284 [1989].) Such evidence was relevant to establish that defendant, in stating "Bust him", was directing that Bates be killed, that the defendant exercised control over his accomplices and that defendant expected that his order would be carried out. The evidence on the People's direct case connected these gangs only with the sale of drugs. Moore was instructed not to testify concerning other violent acts by defendant or by these gangs. Moreover, the defendant was charged with, although not convicted of, burglary. Evidence of defendant's membership in gangs which were engaged in the sale of drugs was probative of defendant's alleged intent in entering and remaining in the basement, without permission of the owners, to sell drugs therein. While we note that this evidence necessarily prejudiced defendant, such prejudice was outweighed by its probative value. *(People v Chang,* 160 AD2d 469 [1st Dept 1990].)

Moore's testimony on redirect examination that an attempt had been made on her life was properly admitted under the circumstances. Defense counsel's cross-examination of Moore focused on the fact that Moore was staying at a hotel during trial and counsel insinuated that the hotel room was provided by the prosecutor in exchange for her testimony. Moore responded that the room was provided because she was in need of protection. Counsel suggested that Moore had tailored her testimony since the prosecution had provided her with money. Moore responded that she was given money because she needed protection. At a sidebar conference the court cautioned defense counsel that such cross-examination opened the door to inquiry on redirect examination as to why Moore received cash and a hotel room and believed herself to be in need of protection. Counsel nevertheless pursued this line of questioning, asking, "Is it a fact, Ma'am that you're here to get money, to stay out of jail and because you have been getting drugs?" Counsel inquired into Moore's drug depen-

dency and asked whether Moore "didn't say anything about Billy Bang shooting anybody until after you got money and drugs and lodging from the District Attorney's Office." The People then sought a ruling from the court as to whether counsel had opened the door to their redirect examination as to Moore's shooting. The court permitted the Assistant District Attorney to ask questions relevant to Moore's state of mind regarding why she was afraid and why she was being paid. The court, however, still precluded questions concerning other threats made to Moore which are not relevant to this appeal. The court then gave a limiting instruction to the jury, explaining that the evidence was relevant only to Moore's state of mind. Moore then testified that on November 10, 1986 she was shot in the head. Because the defendant opened the door to this otherwise inadmissible evidence *(People v Melendez,* 55 NY2d 445, 451 [1982]), the instant challenge is meritless. Moreover, it must be presumed that the jury followed the court's limiting instructions. *(People v Davis,* 58 NY2d 1102, 1104 [1983].)

We have examined defendant's remaining contentions and find them to be without merit. Concur—Kupferman, J. P., Sullivan, Rosenberger, Kassal and Smith, JJ.