McCooe, J.
(dissenting). The judgment of conviction should be reversed and a new trial directed based upon prejudicial evidentiary errors which admitted inflammatory testimony. An appendix of relevant trial testimony is furnished which speaks for itself.
The complainant wife was an Associate Producer of 60 Minutes for CBS and the defendant husband was a New York attorney who were litigating a divorce and custody proceeding in Supreme Court, New York County, when the two incidents occurred. Criticism of prosecuting this case in the Criminal Court was expressed by a Criminal Court Judge at a preliminary hearing.[1]
This prosecution for second degree criminal contempt (Penal Law § 215.50 [3]) and second degree harassment (Penal Law § 240.26 [1]) is founded upon allegations that defendant verbally harassed the complainant on May 7, 1996 and July 28, 1996, and pushed the complainant during the July 28th incident in violation of separate orders of protection. These orders were issued without any hearing to establish their truth. The only direct evidence inculpating the defendant was the complainant’s own testimony. A potential witness to the July 28, 1996 incident, then employed by the complainant as a babysitter, was not called to testify. It appears she did testify in the Supreme Court action.
The complainant was permitted to testify over defense counsel’s strenuous objection what the defendant meant when he called her a “rat.” The court limited the testimony to “an explanation on how he used the term” but allowed testimony as to “any special meaning to you of the term.” She testified that rats were “people from the IRA who had been disloyal to the IRA.” The prosecutor in summation misstated that “she told you * * * rats were people who turn in members of the IRA.” The result was that the complainant testified as to what she thought the defendant meant, which by definition did not apply to her, and the prosecutor misquoted her definition and impermissibly conveyed to the jury that the defendant shared the violent propensity attributed to his unidentified IRA *317 “friends” and that she would be killed. The purpose of this inflammatory testimony was to show guilt by association with a militant political organization. The lack of the complainant’s knowledge of the IRA was obvious when she testified that their first enemy before rats “is the people who do public bombings and stuff.”[2]
*318 The Webster’s New Collegiate Dictionary definition of “rat” is a rodent, a contemptible person or one who betrays or deserts a friend or associate. This is also the generally recognized meaning of the word. Words should be given their plain, ordinary and common meaning. (Finkelstein v Tainiter, 264 AD2d 587, 590.) The court allowed the complainant to give her “special meaning” as to how the defendant used the word without any foundation being laid. There is absolutely no legal basis shown to allow a witness to speculate as to how another person used a common word, particularly when the ordinary meaning is at least equally likely. Based upon the testimony it is more likely that the word rat was, a curse and not a threat. Reading another person’s mind is analogous to the opinion testimony of a lay witness regarding another person’s state of mind which is inadmissible. This is particularly true when the word did not even apply to the complainant under her definition of rat which was “People from the IRA who had been disloyal to the IRA.”
Furthermore the testimony that she would be killed by the IRA was offered to show that she was in fear for her life. There was no basis to allow this testimony. Analogizing this testimony with a cancerphobia case, there must be a “rational basis” for her fear for her life. (Wolff v A-One Oil, 216 AD2d 291.) She never testified to, nor is there any evidence of, physical abuse except the July 28th incident which will be discussed later. Furthermore there is no evidence that even she took this seriously until the time of trial. Therefore no foundation was laid for the admission of this inflammatory testimony which would prejudice the defendant in the minds of most jurors. (People v Smith, 52 NY2d 802, 804.)
The majority cite People v Boyd (164 AD2d 800, lv denied 77 NY2d 904) for the proposition that testimony by the complaining witness was admissible to establish the “special” meaning that the defendant gave to the term “rat.” Boyd does not apply because the witness never testified as to the meaning of the term “Bust him.” The meaning of the term was obvious, never disputed or an issue in the case.
Boyd was indicted with two other defendants for murder. The People sought to establish his accessorial liability and gang leadership and membership with the shooter by an eyewitness who testified that Boyd instructed the shooter to “Bust *319 him” who immediately shot the victim. There was no testimony as to the obvious meaning of the term “Bust him.”
The second proposition that Boyd is cited for is “evidence of defendant’s gang membership.” The complainant’s testimony is that the defendant had friends in the IRA who would kill her. The Court in Boyd admitted evidence of gang membership even though it “necessarily prejudiced defendant” (supra, at 803) “[u]nder the circumstances of this case and considering the overwhelming evidence of defendant’s guilt” (at 803). The differences between Boyd and this case are clear and do not require further elaboration.
It was also error to allow the People to introduce evidence relating to the defendant’s conduct in the September 27, 1995 marital argument involving the complainant as a prior bad act. The complainant’s account of the verbal abuse allegedly initiated by defendant during the two charged incidents, if believed, would establish that defendant’s conduct was actuated by the requisite criminal intent and did not fall within the “distinct classes in which the intent is not to be inferred from the commission of the act, and in which proof of intent is often unobtainable except by evidence of successive repetitions of the act.” (People v Molineux, 168 NY 264, 298.) Therefore, no basis existed for the admission of the alleged prior bad act evidence to establish the defendant’s intent. (See, People v Alvino, 71 NY2d 233, 242; People v Gautier, 148 AD2d 280, 285-287.) Nor was the evidence relating to the September 1995 uncharged incident appropriately admitted to explain either the nature of the parties’ marital relationship or the circumstances surrounding the issuance some months later of the initial protective order.
The trial court and the majority find no error with the admission of testimony regarding the alleged September 27, 1995 incident which People’s brief correctly refers to as an example of one of their “numerous verbal disputes.” This allegedly took place eight months before the first incident in question, six months prior to the first order of protection and while they were living together. He called her a rat which was common as was his string of curses. The real purpose for its introduction was to impermissibly show propensity, was remote in time and had no legal basis.
The principal bases for reversal are the two legal grounds discussed. Nevertheless, a limited discussion of the facts surrounding the two incidents would be helpful to put them in their proper perspective. There is no dispute that the defen *320 dant did not violate an order of protection by his presence at the office or home. The factual issue is what happened there. Part of the complainant’s testimony as to what transpired at the first incident is annexed. This raises both a sufficiency argument and shows her principal reaction was that she was understandably embarrassed and upset at defendant’s presence and continuous verbally abusive conduct but not afraid for her safety even though he had previously called her a rat.[3]
The second incident at the home occurred when the defendant was exercising his visitation rights. He appeared with a backpack which the complainant said was hers and a dispute arose when she reached for it. This argument escalated, and she claims that the defendant pushed her when he called her back to the apartment from the hall. While the defendant’s claim that he went to the complainant’s office because she refused to discuss his concerns about the new babysitter on the telephone is uncorroborated, there can be no dispute that the second incident initially involved the backpack. The nanny was present in the adjoining room with the door closed but her statements to the police at a subsequent investigation were that she was listening. The police arrived following a 911 call, investigated and made a report. The complainant was dissatisfied with the police action and she filed complaints both with the Civilian Complaint Review Board and the Police Department Integrity Control Unit of Internal Affairs against the female police officer. Two complaints were also filed against the male police officer whom she accused of cursing at her. The principal focus of the investigation was whether she reported to the police any injury (a claimed scrape) and whether the reports were properly filled out.
The nanny was not called by the People and the defendant requested a missing witness charge which was denied as untimely. The defendant claims this was error. The nanny was on the People’s witness list but the defendant did not clearly indicate his request for a missing witness charge before the *321 People rested. While there is authority that a request made before rebuttal is timely (People v Robertson, 205 AD2d 243, 245, lv denied 85 NY2d 913) the defendant failed to establish that this witness was under the control of the People at this time.
In the context of this close case which should have pitted the credibility of the defendant against that of the complainant, the cumulative effect of these evidentiary errors and inflammatory testimony was not harmless but tipped the balance and deprived the defendant of a fair trial. The admission of the IRA testimony was the equivalent of a directed verdict. The bedrock principle of our justice system is a defendant’s right to be presumed innocent until found guilty at a fair and impartial trial. (People v Boss, 261 AD2d 1, 2.)
Parness, P. J., and Davis, J., concur; McCooe, J., dissents in a separate memorandum.

. “the court: I think it’s a violation — this case is pursued in this courthouse — I think it’s outrageous and I have done everything I can to make the effort to have it litigated in the proper forum.” (Judge Donna C. Recant, at R 5.)

. “the court: As we have stated — as I have stated several times, I’m not going to allow you to suggest that Mr. Heaney is a member of IRA. The complaining witness must be instructed that under no circumstances is she to mention that; that her testimony regarding the use of the term, rat, should be solely confined to an explanation on how he used the term.” (R 40.) Complainant on direct:
“Q. You said he was calling you a ‘rat’?
“A. Yes.
“Q. What did it mean? Did it have any special meaning to you to be called a rat by Mr. Heaney?
“A. Yes.
“Q. Why?
“A. Throughout our relationship, Mitchell told me that many times he had friends in the IRA Irish Republic Army * * *
“mr. fischman: Objection.
“the court: Overruled.
“A. And the IRA sort of has two enemies. One of them is the people that do public bombings and stuff.
“mr. fischman: Objection.
“the court: Overruled.
“mr. fischman: May we approach?
“the court: No. Ma’am respond to what you mean by the term rats?
“the witness: The other enemy were rats. People from the IRA who had been disloyal to the IRA. Who changed their loyalties. They were rats. They were the lowest, lowest, lowest.
“Q. Did he tell you what his friends would do to rats?
“mr. fischman: Objection.
“the court: Overruled.
“A. Kill them.” (R 74-76.)
“Defense Counsel mr. fischman: At this time, I move for a mistrial based upon, first of all, the witnesses referring to the IRA and Mr. Heaney having friends in the IRA when the ruling was very specific that you ruled that Ms. Weinstein was allowed to explain her understanding of what the word rat meant without her refer [sic] to the IRA. She referred not only to the IRA, that my client had friends in the IRA, but that the IRA kills rats.
“the court: I never said that. I didn’t say there would be no reference to the IRA. I said that she was not to state that he was a member of the IRA. I asked her specifically and she responded by giving an explanation of how the term was used. So your application is denied in all respects.” (R 109-110.)
“the court: Overruled.
“summation by assistant district attorney: She told you that the defendant used to talk about that he had friends that were in the IRA, and that rats were people who turned in members of the IRA, and rats should be *318 killed. That’s what he was calling her, a rat, a whore, a cunt, you’re going to be sorry for everything you did.
“me. fischman: Objection.” (R 621.)

. The complainant on direct testified that the defendant appeared at her office unannounced and cursed at her.
“A. * * * and I finally then just got on the phone to try my lawyer again and Mitchell left.
“Q. How loud was his voice?
“A. Not too loud. It was raised, but he wasn’t screaming. It was more like a driving and gesturing.
“Q. How did it make you feel at the time, him doing this at your job?
“A. In and of itself, it was scary to have him there. If my colleagues had found out, I would have been mortified.” (R 54.)