[597 NYS2d 975]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
REBECCA ASHNER, Appellant.

Second Department, May 17, 1993

APPEARANCES OF COUNSEL

*Arnold S. Kronick,* White Plains, for appellant.

*Kevin L. Wright, District Attorney* of Putnam County, Carmel *(Mary Jane MacCrae* of counsel), for respondent.

**OPINION OF THE COURT**

COPERTINO, J.

The defendant was indicted and charged with one count of grand larceny in the third degree (Penal Law § 155.35) and 25 counts of forgery in the second degree (Penal Law § 170.10 [1]). All charges stemmed from a complaint made by her former employer, a bank where she had been employed as a teller. She was accused of making or completing 18 withdrawal slips between November 14, 1988 and September 28, 1989, without authorization, enabling her to steal approximately $30,000 belonging to one of the bank's customers. Eighteen of the forgery counts concerned the customer's signature on these slips, and seven had to do with the initials of the defendant's

supervisors. After a jury trial, the defendant was found guilty of grand larceny in the third degree and 23 counts of forgery. The principal question before us concerns a limitation on cross-examination. We must decide whether the court improperly limited the defendant's constitutional right to confront the witnesses the State brought against her by precluding the use of questions which suggested that one witness might have had a motive to commit the crimes with which the defendant was charged. We hold that it did, and that a new trial must result. Moreover, upon a review of the defendant's claim that the evidence was legally insufficient to support the judgment of conviction, we dismiss three counts of the indictment outright.

A bank customer who owned several certificate of deposit (hereinafter CD) accounts, came to the bank's Carmel branch in November 1989 in order to update her bank books. Though her CD's had not yet reached maturity, the bank was to post the interest which had accrued to that time. During this routine procedure, the customer complained that money was missing and that she had not withdrawn any. On instructions from the Assistant Manager, the employee who had been assisting this customer retrieved the 18 withdrawal slips for the period in question, and the customer said she had not signed them. The teller number stamped on each (except one which contained none) belonged to the defendant.

The bank's internal investigation proceeded from that point and ultimately led to the defendant's indictment. At trial, it was the bank's Assistant Manager who gave the most extensive testimony as to both bank procedures and the defendant's activities relevant to the charges. The witness testified as to how CD withdrawals were supposed to be made, including how premature automatic withdrawal penalties were usually assessed. In this case, automatic penalties should have been assessed, but were not. However, the penalty could be waived with the approval of a supervisor. The witness also testified as to how a teller gained access to the bank's computer system, which involved the use of a teller password. She described how any withdrawal of over $1,000 had to be verified by a supervisor to insure that the transaction as set forth on the slip had occurred, and that this verification was indicated by the supervisor's initials on the document. Shown exhibits 4, 6, 9, 10, 11, and 18—all withdrawal slips bearing the defendant's teller number and indicating withdrawals of $1,000 or more— she denied that her initials, which were found on each with-

drawal slip, were made by her, and also stated that she did not give the defendant permission to use her initials. The 18 unauthorized withdrawals totalled $29,700.

The witness also identified copies of bank printouts concerning the defendant's personal savings and checking accounts with the bank, and deposit slips related thereto. Several 1989 cash deposits were for $1,000 or more. She testified that the defendant's salary was $263 per week, and, referring to bank attendance records, testified that only the defendant and one other teller had been present and working on all of the days the withdrawals were made.

On cross-examination, the defense elicited certain facts in the defendant's favor. The bank's time records seemed to indicate that the defendant was not "logged on" to the system at the times two of the withdrawal slips indicated the withdrawals were made, and, given the fact that the bank's computer clock ran on military time, two other withdrawals had occurred between 1:00 A.M. and 2:00 A.M. The witness also admitted that on a day she stated she was absent from work, the log-on/log-off records indicated that her computer had been in use, and that she had signed these records.

When the questioning turned to the Assistant Manager's personal life, the trial court intervened. The defense counsel's question "Did you have any unusual expenditures of funds between November of 1988 and the end of 1989?" drew an objection from the prosecutor as well as a request for an offer of proof. The jury and the witness were excused from the courtroom and a colloquy ensued.

The defense counsel stated that he wanted to ask the witness about a trip she had taken to Ireland with her family, the purchase of a car, and her husband's need to pay for the services of an attorney, all coinciding with the period during which the alleged thefts occurred. The prosecution objected on the grounds of relevance, arguing that there was absolutely no reason to believe that the Assistant Manager had any connection to the withdrawals, and that "coincidence is not proof". The following then occurred:

"THE COURT: Do you have any knowledge, do you have any facts you can give me concerning the source of the money they used to go to Ireland with or what they paid the lawyer with or how much they paid the lawyer, or did the lawyer get paid period? Do you have anything like that?

"[Defense Counsel]: I don't think we do.

"THE COURT: If you don't have anything like that, you're fishing. All you're doing is throwing it out besmirching their reputation in front of the jury".

The court sustained the objection, and no further cross-examination concerning the issues on appeal followed. It should be noted at this juncture that after jury deliberations began, for purposes of the record, the defense counsel presented proof of the Assistant Manager's family's need for an attorney, to wit, a local newspaper article of March 8, 1989, regarding criminal charges brought against her husband.

Because the legal sufficiency of the People's case also is at issue, a summary of the other proof will be made. The customer denied that she had completed and signed the withdrawal slips. However, on cross-examination she testified that one of these passbooks showed a $2,000 withdrawal on May 5, 1989, another withdrawal of $2,000 on June 22, 1989, and a $3,000 withdrawal on September 28, 1989. These dates and figures coincided with those on three of the withdrawal slips the defendant had been charged with forging.

There also was testimony from another teller who stated that in accord with bank rules which prohibited employees from handling their own accounts, she had personally made "about 12" of the 15 deposits made to the defendant's personal account during the relevant period, totalling $12,986. However, on cross-examination this teller acknowledged that the defendant had told her that her uncle, whom the teller knew, was using her account because he did not have one. This witness also acknowledged that she herself had sometimes placed a supervisor's initials on bank documents if the press of business made it convenient to do so. Relatedly, another witness, the Branch Manager, denied that she had initialed one of the slips which bore her initials, but acknowledged that several employees other than the defendant had used her initials on bank documents without permission. Still another prosecution witness, an investigator employed by the Putnam County Sheriff's Department, testified that handwriting samples of the defendant, together with the 18 withdrawal slips, had been sent to the New York State Police for analysis. No samples from any other bank employee were analyzed. The New York State Police Crime Laboratory was unable to conclude that the writing on the slips was that of the defendant.

Two other prosecution witnesses were bank employees

whose testimony concerned bank records and the defendant's own statements. The bank's Regional Administrator testified concerning the bank's computer records, and interpreted log-on and log-off times for the defendant which placed her on the system when certain disputed withdrawals were made. However, the accuracy of the time stamped on the withdrawals was called into question on cross-examination when counsel pointed out that the times indicated on three of the withdrawal slips were inconsistent with the time noted for such withdrawals by the main computer in California. The witness opined that the discrepancy could be explained if it were assumed that the local branch set its clock incorrectly.

The final prosecution witness, a security manager employed by the bank, testified that during the course of his investigation, he confronted the defendant with the withdrawal slips. She told him that she had worked on all the transactions, and that no one else had access to her password. Although she had admitted placing her supervisor's initials on the slips, she denied having forged the customer's signature on any of them. On cross-examination this witness admitted that notwithstanding his experience as a 20-year veteran of the New York City Police Department, he had taken no notes of his conversation with the defendant and was testifying solely from memory (the interview had taken place over a year before the trial). Moreover, in a statement he had given to the police on the day of the interview, (1) he had reported showing the defendant only seven of the withdrawal slips, not all 18, and (2) there was no mention of the password.

The People rested, and the jury heard and considered one witness for the defense, the defendant's uncle. He testified that he worked as a blacksmith at racetracks located in Yonkers and Monticello. Because he was a poor bookkeeper, he had asked his niece to deposit money he gave her into her account and to issue checks in favor of his creditors. Much of the money she deposited for him was in cash.

The jury convicted the defendant of all but two counts: forgery of the customer's name on the withdrawal slip on which no teller number appeared, and forgery of the Assistant Manager's initials on the September 28, 1989 withdrawal slip.

### THE LEGAL SUFFICIENCY OF THE PEOPLE'S CASE

■ On this appeal the defendant contends that the prosecution failed to prove her guilt beyond a reasonable doubt of the

larceny and the forgeries. In connection with the forgery offenses, the defendant asserts that the evidence presented by the People did not establish that she signed the name of the victim on the withdrawal slips. Regarding the placement of the supervisor's initials thereon, the defendant argues that, although she did not have the specific consent of her supervisors to do so, the inference to be drawn from the evidence presented by the People is that this was "a common, unofficially accepted and usual practice" engaged in by tellers for their convenience. At best, the People proved that she processed the transactions, but not that she committed forgery. With respect to the larceny, the defendant contends that the sums of money deposited in her accounts with the bank do not sufficiently correspond with the sums of money alleged to be the subject of the thefts so as to justify an inference of larceny. As to both the larceny and forgery charges, the defendant points out that given the absence of any explanation as to how withdrawals were made from the victim's account with no penalty being assessed—a process that required the intervention of a supervisor—there was significant doubt about her guilt. The three withdrawals noted in the victim's passbook also are cited as casting similar doubt. In sum, the defendant asserts that in view of all the contradictions and discrepancies in the record, the circumstantial evidence is equivocal at best and a reasonable doubt exists regarding guilt of all of the crimes charged.

The People contend that the defendant's guilt of the crimes charged was proven beyond a reasonable doubt. Specifically, the People argue that the evidence established that the transactions, including the forged withdrawal slips, were processed by the defendant. They note that the defendant admitted that she would not have processed the transactions if a passbook had not been presented, and point out that the victim testified that no one other than she had access to her passbooks. Furthermore, the People argue that the sums of money deposited in the defendant's savings and checking accounts were unusual, given her salary. Additionally, they urge that the fact that penalties were not imposed on the victim's account in light of the early withdrawals does not raise a reasonable doubt regarding whether the defendant committed the crimes charged.

It is well settled that in reviewing a finding of guilt on the ground of legal sufficiency this Court is required to view the evidence in the light most favorable to the People (see, People

*v Contes,* 60 NY2d 620). Further, in testing the sufficiency of a conviction based solely on circumstantial evidence, as is the case here, the conclusion of guilt must be consistent with and flow naturally from the proven facts, and those facts, viewed as a whole, must exclude to a moral certainty every other reasonable hypothesis save guilt *(see, People v Mattiace,* 77 NY2d 269, 273; *People v Kennedy,* 47 NY2d 196, 202; *People v Benzinger,* 36 NY2d 29). "In the end it is a question whether common human experience would lead a reasonable [person], putting his [or her] mind to it, to reject or accept the inferences asserted for the established facts" *(People v Wachowicz,* 22 NY2d 369, 372).

Insofar as is relevant here, forgery in the second degree is defined as falsely making or completing a written instrument calculated to become, if completed, an instrument which creates a legal right, done with intent to defraud another (Penal Law § 170.10 [1]). Here, that right was to withdraw money from a bank account belonging to the victim. We conclude that the evidence, viewed as a whole, was insufficient to exclude all reasonable hypotheses except guilt of this crime regarding the three withdrawals which were recorded in the victim's passbooks. There was no proof that any of the victim's passbooks came into the defendant's possession except insofar as such were presented to her by the victim as part of a routine transaction. It is therefore reasonable to infer that the victim, or someone who had access to her passbooks, and not the defendant, was the party who made or completed the withdrawal slips on those days by signing the victim's name. Accordingly, we dismiss counts 13, 15, and 19 of the indictment, which are based on the withdrawal slips dated May 5, 1989, June 22, 1989, and September 28, 1989. We note that the defendant was acquitted on count 26, which was based upon forging the Assistant Manager's initials on the September 28, 1989, withdrawal slip.

We are satisfied that the evidence before the jury was sufficient to sustain the judgment of conviction as to the remaining counts. A rational trier of fact could have found from the evidence before it that the crimes charged as to the balance of the withdrawals had been established beyond a reasonable doubt *(see, People v Lewis,* 64 NY2d 1111, 1112; *People v Pena,* 50 NY2d 400, 409, *cert denied* 449 US 1087). Further, upon the exercise of our factual review power *(see,* CPL 470.15 [5]), we find that so much of the verdict which

concerned these counts was not against the weight of the evidence adduced at trial.

We turn then to the defendant's objection to the trial court's limitation on cross-examination, which would have placed additional testimonial evidence before the jury.

### THE RESTRICTION ON CROSS-EXAMINATION

■ The defendant contends that the court abused its discretion and abridged her right to establish a defense by limiting the cross-examination of the Assistant Manager. The People respond by asserting that there was not a good-faith basis for the questions the defense counsel wished to propound, and, relatedly, that there was no connection established between this case and the expenditures and financial needs of the witness or her family.

The right of cross-examination is included in the Federal and State constitutional right of the accused to confront the witnesses against her (US Const, 6th Amend; NY Const, art I, § 6; *Davis v Alaska,* 415 US 308; *Pointer v Texas,* 380 US 400; *People v Hudy,* 73 NY2d 40). However, trial courts retain wide discretion to limit cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant" *(Delaware v Van Arsdall,* 475 US 673, 679; *see also, People v Schwartzman,* 24 NY2d 241, 244, *cert denied* 396 US 846; *People v Sorge,* 301 NY 198). In addition, even if the court improperly curtails the defendant's right to cross-examine a prosecution witness, such an error is not per se reversible *(see, People v Allen,* 67 AD2d 558, 560, *affd* 50 NY2d 898). Thus, if error is found, an appellate determination must be made as to whether the error was harmless beyond a reasonable doubt *(Chapman v California,* 386 US 18, 21-24; *People v Crimmins,* 36 NY2d 230, 237).

Our initial task is to determine if the restriction was error. The test is whether the trial court's ruling prevented an *effective* cross-examination *(see, Davis v Alaska, supra,* at 318). One court has suggested the standard of review which should be employed by an appellate court is one which measures the scope of cross-examination permitted by the trial court against the reviewing court's assessment of the appropriate degree of cross-examination necessitated by the subject matter of the cross-examination, as well as the other circumstances that prevailed at the trial *(Goldman v United States,* 473 A2d 852,

857 [DC App]). As has been noted, this indicates the subjective nature of such decisions and the importance placed on the peculiarities of each case (note, *The Sixth Amendment Right To Confrontation Where Reliability or Credibility Of A Witness Is At Issue: The Extent And Scope Of Cross-Examination,* 34 Cath U L Rev 1267, 1271 [1985]). All determinations, however, rest on an analysis of counsel's goal in pursuing a given line of questions, as well as the probative value of the questions themselves. In this particular case we also must be mindful that while there is discretion, and upon demand for an offer of proof counsel is required to provide some good-faith basis for his questions *(United States v Katsougrakis,* 715 F2d 769, 779, *cert denied* 464 US 1040), curtailment will be judged improper when it keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony *(see, Gordon v United States,* 344 US 414, 423; *United States v Pedroza,* 750 F2d 187, 195).

A review of the trial transcript reveals that defense counsel's goal was to place his client's guilt in doubt by suggesting that the Assistant Manager herself had both a need and an opportunity to engage in the thefts at least equal to the defendant's. An unavoidable corollary would be that the witness had a motive to testify falsely against the defendant.

It must be remembered that the case against the defendant was entirely circumstantial, and as such was built on inferences drawn from bank procedures, documents, and the defendant's personal circumstances—in particular, the evidence that she handled the subject transactions, her modest salary, and the activity in her own account. Thus, it was not unreasonable for the defense to pursue a line of questions with a witness whose own knowledge of procedure, access to bank records, and her own personal circumstances might have caused the investigation to turn to her as a suspect. A witness's desire to avoid being investigated himself was one of the factors noted by the Supreme Court in *Davis v Alaska* (415 US 308, *supra).* There, too, there was no proof that the witness had had anything to do with the crime; yet the Court pointed out that in view of his criminal history, fear of being named as a suspect might have had an impact on how he would react to pressure to inculpate the defendant. Thus, even assuming that the Assistant Manager had nothing to do with the thefts, the jury might have concluded that she had a personal reason to assist the prosecution in implicating the defendant and bringing the process to an expeditious termina-

tion with an arrest and conviction. It can readily be inferred that by pursuing the witness's financial circumstances, the defense counsel was attempting to demonstrate a motive to fabricate some of her testimony. The limitation placed on this proposed line of questioning thus cannot be considered an acceptable exercise of discretion intended to protect the witness from embarrassing questions *(see, Davis v Alaska,* 415 US 308, 319, *supra),* inasmuch as the questions could have established reasons for the witness to fabricate, which can never be deemed collateral to the issue of defendant's guilt *(see, People v Hudy,* 73 NY2d 40, 56, *supra; People v Gaskin,* 170 AD2d 458).

In sum, we do not believe that this was a case where the cross-examination thwarted by the trial court was to consist of nothing more than disparaging questions bearing on credibility but irrelevant to the issues of the defendant's guilt, unreviewable in the absence of a clear abuse of discretion *(see, People v Caviness,* 38 NY2d 227, 232; *People v Duffy,* 36 NY2d 258, 262-263, *cert denied* 423 US 861). "We cannot speculate as to whether the jury * * * would have accepted this line of reasoning * * * [b]ut we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the witness's] testimony which provided 'a crucial link in the proof * * * of [the defendant's] act' " *(Davis v Alaska, supra,* at 317, quoting *Douglas v Alabama,* 380 US 415, 419).

Because the error here was of constitutional dimension, we must reverse and order a new trial on the remaining counts of the indictment unless there was no reasonable possibility that the error might have contributed to the defendant's conviction —that is, that the error was harmless beyond a reasonable doubt *(see, Chapman v California,* 386 US 18, 21-24, *supra; People v Crimmins,* 36 NY2d 230, 237, *supra).* We conclude that the error here was not harmless. Had the defendant been able to convince the jury that the defendant's supervisor had reason to fabricate or shade any of her testimony, the prosecution's case would have been weakened—perhaps considerably. While the testimony of the other witnesses and the documentary proof introduced during such testimony was sufficient to support the judgment of conviction (excepting the three counts previously discussed), this evidence was not so overwhelming that we can conclude, beyond a reasonable doubt, that, irrespective of the error, the jury's verdict would have been the

same. A new trial on the remaining counts of the indictment therefore is warranted.

We note that we have examined the defendant's remaining contention regarding the court's charge on circumstantial evidence and find it to be unpreserved for appellate review, and, in any case, without merit *(see, People v Bryant,* 122 AD2d 220).

Accordingly, the judgment is reversed, on the law, counts 13, 15 and 19 of the indictment are dismissed, and a new trial is granted with respect to the remaining counts.

BRACKEN, J. P., LAWRENCE and RITTER, JJ., concur.

Ordered that the judgment is reversed, on the law, counts 13, 15 and 19 of the indictment are dismissed, and a new trial is granted with respect to the remaining counts.