[787 NYS2d 241]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CORBY NORCOTT, Appellant.

First Department, December 16, 2004

## APPEARANCES OF COUNSEL

*Andrew C. Fine* and *Laura R. Johnson, The Legal Aid Society*, New York City (*Alan S. Axelrod* and *Bertrand J. Kahn* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney*, New York City (*Theresa A. Foudy* and *Patricia Curran* of counsel), for respondent.

## OPINION OF THE COURT

FRIEDMAN, J.

The primary question on this appeal, involving a robbery that resulted in a vicious murder, is whether the trial court committed reversible error when it precluded defense counsel from eliciting testimony that was intended to show that the prosecution's main witness had a motive to lie to implicate defendant in the crime. We find that we need not determine whether the challenged ruling was erroneous because the record before us makes it clear, beyond a reasonable doubt, that the witness's motive to lie was readily apparent to the jury, and, therefore, the court's error, if any, was harmless.

Defendant was charged with having acted in concert with two accomplices to rob and murder a man named Yousef Mohammed. According to the People, defendant and his accomplices lured Mohammed to an apartment by proposing to buy drugs from him. When Mohammed came to the apartment to conduct the proposed drug deal, defendant and his accomplices allegedly robbed and killed him. At defendant's trial, the prosecution's main witness was Xanderia Burnett, the tenant of the upper Manhattan apartment where the murder occurred. The substance of Burnett's direct testimony, as well as certain other evidence presented at trial, is summarized below.

In early January of 1996, Burnett happened to see defendant, an old acquaintance of hers, at a bar. After talking to Burnett for a while, defendant offered to pay her $1,500 if she would allow him to use her apartment to "meet up" with a "friend." Burnett, who understood that defendant wanted to close a drug deal in her apartment, agreed to the proposal. Shortly thereafter, defendant and a confederate of his, whom Burnett knew as "Moe," moved into Burnett's apartment, apparently intending to stay until the deal could be transacted.

About a week and a half after defendant and Moe moved into Burnett's apartment, defendant told Burnett that "his friend was in town," and that defendant wanted Burnett "to go down to meet his friend." Burnett agreed, and defendant drove Moe and Burnett (whose two-year-old son was with her at the time) from Burnett's apartment building to a downtown hotel. The group proceeded to one of the hotel rooms, where defendant knocked on the door. A man opened the door, and the group entered the room. The man who opened the door was introduced to Burnett as "Yousef." During the visit, which lasted from 45 minutes to an hour, defendant and Yousef engaged in a conversation that Burnett did not overhear. Defendant and his group then returned to Burnett's apartment.

At some point while defendant was living in the apartment, Burnett observed him sitting in her living room, loading bullets into a handgun. She told him to get the gun out of the apartment, and he said he would do so.

On January 22, 1996, shortly after the day of the gun-loading incident, defendant, Moe and "Farrow," a second confederate of defendant, drove from Burnett's apartment down to Yousef's hotel in two cars, with Burnett in one of the cars. Yousef then joined the group, whereupon they all drove back to Burnett's apartment. After the group arrived at the apartment, Burnett and defendant left, at defendant's suggestion, to visit defendant's parole officer, while Yousef, Moe and Farrow remained behind in the apartment.

When Burnett and defendant returned to the apartment from the parole office, Moe and Farrow were sitting in the living room watching television, but Yousef was nowhere in sight. Burnett asked where Yousef was, and received no answer. Defendant, on the other hand, asked Moe and Farrow if they had gotten "the key," whereupon the three men went into a bedroom, closing the door behind them. After several minutes, the men emerged from the bedroom, and defendant demanded that Burnett accompany him to the victim's hotel. Burnett did so, and, on the way to the hotel, defendant told Burnett that he wanted her to help him "carry some drugs back." Upon arriving at the hotel, Burnett saw defendant use a key to let himself into the victim's hotel room, after which he located and removed a number of taped-up "little brown lunch bags," which defendant said contained the drugs he wanted.

When Burnett and defendant returned to her apartment from the hotel, defendant, Moe and Farrow again went into the

bedroom where they had previously met, and spent about 15 minutes in the room with the door closed. After the men emerged from the bedroom, they left the door ajar, and Burnett noticed Yousef's body lying face-down on the bed in that room, with a bleeding head wound. Burnett asked what happened, and defendant told her to "calm down" or else she would "be dead too." Burnett then saw defendant, Moe and Farrow divide the bags from Yousef's hotel room among themselves. When it became dark, defendant demanded that Burnett help remove the body from the apartment, which she did. She then cleaned up the blood in the apartment, also at defendant's demand.

Defendant continued to live in Burnett's apartment until the April following the murder, when he was arrested for an unrelated parole violation. Even after defendant was gone, Burnett never reported the murder to the police on her own initiative because, she said, she feared what defendant might do to her or her family. For the same reason, she moved out of state in January 1997, after she learned that defendant was being released from jail.

On January 31, 1996, a police detective investigating the murder of Mohammed (whose body had been discovered on January 23) visited Burnett's apartment.[1] Defendant answered the door, and told the detective that Burnett was not home, whereupon the detective left. The detective returned to the apartment on February 2, 1996, and this time spoke to Burnett; he also observed defendant within the dwelling. Although Burnett told the detective defendant's name at that time, she did not disclose anything relating to the homicide because defendant had threatened to harm her son (who was in the apartment at the time) if she did.

In July 1998, the same detective who had interviewed Burnett shortly after the murder visited Burnett at her new home in another state. The detective began by showing Burnett photographs of defendant and Mohammed, among other people; she admitted that she recognized defendant, but denied that she

---

**1.** It appears that the police first connected Mohammed to Burnett's apartment from information provided by a bank branch listed on handwritten notes the police found in his hotel room after the body was discovered and identified. The bank had sent an order of checks for Mohammed to him in care of Burnett at the apartment. Burnett testified that she received such checks in the mail on the day of the murder; she further testified that she wrote "Return to Sender" on the envelope containing the checks and put it back in the mailbox.

recognized Mohammed. After some further discussion (the substance of which was not disclosed to the jury), Burnett "broke down" and began to cry. She then accompanied the detective to a police station, where, after being read her *Miranda* rights, she made a statement implicating defendant, Moe and Farrow in Mohammed's murder. Defendant was arrested the following October; Moe and Farrow have never been apprehended.

In addition to the foregoing evidence, the People presented telephone records demonstrating, among other things, that calls were exchanged during the relevant period between Mohammed and the Florida home of defendant's parents. The People also presented papers found in Mohammed's hotel room that contained handwritten notations of defendant's name and of telephone numbers where he could be reached. Based on such evidence, and additional evidence that, among other things, connected defendant to Mohammed, Moe and Farrow, and placed him at Burnett's apartment during the time period of the murder, the jury convicted defendant of second-degree murder and first-degree robbery. On defendant's appeal, we affirm the judgment of conviction.

We first address defendant's contention that the trial court committed reversible error in an evidentiary ruling it made during defense counsel's cross-examination of Burnett. The ruling in question precluded the defense from eliciting testimony to the effect that Burnett, when she was interviewed out of state by the police detective in July 1998, implicated defendant in Mohammed's murder only after the detective told her that defendant had already accused *her* of complicity in the crime. After the court disallowed this line of inquiry in the questioning of Burnett, defense counsel asked to be permitted to pursue it upon cross-examination of the detective; this request was also denied.

It is defendant's theory that evidence that the detective told Burnett that defendant had accused her of complicity in the robbery/murder was crucial impeachment material. As defendant sees it, bringing this information out at trial would have demonstrated to the jury that Burnett had a specific motive to lie to implicate defendant in the crime, namely, to shift blame from herself to the man she had been told was her accuser

(whether or not he had actually made such an accusation).[2] As defendant points out, a witness's "reason to fabricate is never collateral and may not be excluded on that ground" (*People v Hudy*, 73 NY2d 40, 56 [1988], *abrogated on other grounds by Carmell v Texas*, 529 US 513 [2000]; *see also Davis v Alaska*, 415 US 308, 316-317 [1974] ["exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination"]). While defendant (who did not present any evidence at trial) readily concedes that the information in question was not admissible as evidence of Burnett's complicity in the robbery/murder, defendant contends that the court could have obviated any prejudice to the People in this respect by instructing the jury not to consider the information for that purpose. Therefore, defendant argues, the court, in imposing the challenged limitation on the scope of his counsel's cross-examination, not only abused its discretion in applying the law of evidence, but also violated his right to confront his accuser under the federal and state constitutions (US Const Amends VI, XIV; NY Const, art I, § 6).

We find this argument unavailing, even if the challenged ruling was erroneous. An error of constitutional dimension at a criminal trial, such as defendant claims to have occurred here, is considered harmless if "there is no reasonable possibility that the error might have contributed to defendant's conviction and . . . it was thus harmless beyond a reasonable doubt" (*People v Crimmins*, 36 NY2d 230, 237 [1975], citing *Chapman v California*, 386 US 18 [1967], and *Fahy v Connecticut*, 375 US 85 [1963]; *see also People v Kello*, 96 NY2d 740, 743 [2001]; *People v Robinson*, 89 NY2d 648, 657 [1997]; *People v Eastman*, 85 NY2d 265, 276 [1995]). Even under this standard, the error posited by defendant was harmless.

By no means do we deny the centrality of Burnett's testimony to the People's case; as the prosecutor stated in his summation, "she's absolutely the key witness." Nonetheless, the conclusion that the court's error, if any, was harmless beyond a reasonable doubt becomes inescapable when one considers that the motive Burnett had to accuse defendant—her natural desire to deflect suspicion of complicity in the murder away from herself, and toward another—was already manifest to the jury without the precluded line of inquiry.

---

2. It is not clear whether defendant actually made the accusation of which the detective informed Burnett. For that reason, defense counsel suggested that, if his proposed line of inquiry were permitted, the court instruct the jury that there was no proof that defendant had ever made such an accusation.

As should be clear from the foregoing summary of Burnett's direct testimony, her entire account is pregnant with the jeopardy in which she found herself as a result of this sordid crime. According to Burnett, the murder was committed in her own apartment, by men she had invited in to engage in what she expected to be a different kind of criminal transaction (i.e., a drug sale); after the victim had been murdered, she helped to remove the body, and cleansed the apartment of the victim's blood; she never reported the murder to the police on her own initiative; and, when the police initially questioned her, she did not disclose her knowledge that a murder had been committed in her apartment. As the dissent acknowledges, the question of whether Burnett was an accomplice to the robbery and murder was submitted to the jury based on the undisputed facts "that [Burnett] was aware of and facilitated the drug deal, [that] the murder occurred in her apartment, [that] she admitted that she was present shortly after the fatal shot, and . . . [that] she [admittedly] helped clean up and dispose of the body." Given that all of these facts had been received into evidence, it was simply impossible for the jury not to have been aware of the danger posed to Burnett by the investigation of this crime, and of her motive to say anything, whether true or false, to save herself from the specter of a lengthy prison sentence.

Not only was Burnett's general motive to blame others for the robbery/murder obvious to the jury from her own direct testimony, it would have been equally obvious to the jury that this witness had a specific motive to accuse defendant (and his two accomplices) in particular. If Burnett were to succeed in deflecting suspicion away from herself by accusing others, that accusation would have to have been directed at a person or persons who could plausibly be implicated in the wrongdoing. There is no dispute that the only people who fell into this category were defendant and his accomplices. Although the defense denies that defendant intended to rob or murder Mohammed, defendant's trial counsel, in his summation, did not attempt to persuade the jury that the People had not proven that defendant lived at Burnett's apartment from January to April of 1996 (in fact, as previously indicated, a detective saw and spoke to defendant at the apartment nine days after the murder, and again saw defendant at the apartment two days later).[3] Nor did defense counsel attempt to persuade the jury that the People

3. Thus, the People did not depend on Burnett's testimony to place defendant at the apartment where the murder took place. We note that, through,

had not proven that defendant and his accomplices were involved in planning to transact a drug deal with Mohammed in Burnett's apartment on January 22, 1996; that defendant helped himself to Mohammed's drugs after the murder took place; or that defendant subsequently disposed of Mohammed's body with his accomplices. Given that the foregoing facts were not in serious dispute at trial, defendant and his accomplices were the only people whom Burnett could plausibly accuse of responsibility for Mohammed's death, and Burnett's powerful incentive to accuse defendant was clear as day to the jury from the testimony it actually heard.

In fact, the record shows that defendant's trial counsel, in his summation, pointed out that Burnett had a specific motive to implicate defendant in the robbery and murder, and the challenged ruling limiting the scope of cross-examination presented no impediment to that argument. "Let's see if there is some possible self-interests that could give [Burnett] a reason for not being truthful about what went down inside her house," defense counsel suggested to the jury. Counsel subsequently elaborated on this point as follows:

> "[W]ould she have a motive to lie about this? Because I said even someone who's a professional liar can tell the truth if there's no reason to lie. What you realize is not only is she a general liar, not only is her story different, but she has to lie here too. That once again it's in her self-interests to lie and we know that, that's when she shines as a creator of fiction.

> "It's July 1998, the cops come around and ask her some questions, no Corby [defendant] around, no threats, she still lies but they don't leave and they're showing her pictures of Corby. How's she gonna get out of it now? Tell the truth, tell them she and Corby went down for the drugs? Tell them that she and Corby decided to share in the loot? Tell them she was an active participant, not a helpless victim who just stuck her finger into it a little? Tell them that she got herself involved in a major drug ripoff? Not a prayer. Who knows where that leads, maybe

---

inter alia, telephone records and the notes found in Mohammed's apartment, the People also connected defendant to Mohammed, Moe and Farrow independent of Burnett's testimony.

you end up sitting in that chair [i.e., as the accused]. No, it was Corby, officer, I was just doing it to get a little taste. Oh, no, he made me do it. Why couldn't I talk to you before? Well, he had my daughter, my son. Her motive to lie against Norcott Corby, well look what happened, she's read her rights and says it's Corby who did this, I just participated a tiny bit and she goes home, she's released. The master has lied herself out of a jail station—a police station again . . . . She knows just how much to say about drugs, all her associates have taught her for years. She gets out by dumping on him, gotta make it good, gotta admit the little bit that doesn't really hurt you. And as long as she keeps it up, as long as she repeats it here in court, no one [is] really scrutinizing her, and it works, as long as you all buy it."

Thus, contrary to the dissent's assertion, informing the jury that Burnett had been told of an accusation against her by defendant was not "necessary to challenge the reason or motive for [Burnett] to identify defendant as the murderer after a two-year silence." The dissent's claim that the challenged ruling "force[d] the defense to question Ms. Burnett's motive to lie indirectly" is contradicted by defense counsel's closing argument.

In sum, allowing the defense to bring out that Burnett accused defendant of the murder after she was informed of defendant's alleged accusation against her would not have added materially to the jury's understanding of Burnett's dire situation, and of the pressures that gave her reason to try to shift blame for Mohammed's death away from herself and toward defendant. Thus, giving full effect to the principle that "the focus of the prejudice inquiry in determining whether the confrontation right has been violated must be on *the particular witness*" (*Delaware v Van Arsdall*, 475 US 673, 680 [1986] [emphasis added]), we conclude that any error in the challenged ruling was harmless. The obviousness of Burnett's motive to accuse defendant renders the challenged limitation of the scope of cross-examination harmless beyond a reasonable doubt, and readily distinguishes the instant case from the cases on which defendant principally relies, where the witness's motive to lie was not similarly obvious from the testimony the jury actually heard (*see Davis v Alaska*, 415 US 308 [1974], *supra* [defense was precluded from bringing out the probationary status, based on a confidential juvenile delinquency adjudication, of prosecu-

tion's main witness]; *People v Rios*, 223 AD2d 390 [1996], *appeal withdrawn* 87 NY2d 1024 [1996] [defendant was precluded from bringing out, for the purpose of showing possible police bias in charging him with selling drugs, that, inter alia, the other participant in the transaction had told the arresting officer that her husband was a police officer]; *People v Ashner*, 190 AD2d 238, 247 [1993] [defense was precluded from bringing out that prosecution's main witness "had both a need and an opportunity to engage in the thefts at least equal to the defendant's"]).

As previously indicated, we find it unnecessary to decide whether the challenged evidentiary ruling was erroneous. We observe, however, that a strong argument could be made that the ruling was correct, both as a matter of the law of evidence and as a matter of constitutional law under the Confrontation Clause, along the same lines that lead us to conclude that the ruling was harmless to the defense beyond a reasonable doubt. Again, the witness's specific motive to lie was abundantly clear to the jury without interjecting the additional information that defendant proposed to bring out on cross-examination. It thus would appear that the court appropriately exercised its discretion to exclude the detective's statement to Burnett that defendant had implicated her in the crime, for introducing such evidence would invite the jury to speculate on the truth of defendant's alleged accusation of Burnett. As even the dissent acknowledges, "the proffered cross-examination might have also allowed the defense to indirectly raise the issue of whether Ms. Burnett was the true murderer." Of course, there was no admissible, nonhearsay evidence to prove the truth of this accusation, even if it was made. Therefore, to permit speculation on this matter might have seriously prejudiced the People's case. Thus, it seems to us that the court's ruling may very well have been within the bounds of its discretion, under both the Confrontation Clause and the law of evidence, to exclude from cross-examination any matter whose "probative value is substantially outweighed by the danger that it will unfairly prejudice the other side or mislead the jury" (*People v Scarola*, 71 NY2d 769, 777 [1988]; *see also Delaware v Van Arsdall*, 475 US at 679 [a trial judge retains "wide latitude" under the Confrontation Clause to impose reasonable limits on the scope of cross-examination, "based on concerns about, among other things, . . . prejudice, confusion of the issues, . . . or interrogation that is . . . only marginally relevant"]).

Defendant's remaining arguments are without merit. Contrary to defendant's contention, the verdict was based on legally sufficient evidence, and fully comported with the weight of the evidence. In this regard, we note that, from the uncontradicted evidence presented to the jury of defendant's conduct before and after Mohammed's death, the inference was inescapable that defendant was, at a minimum, an intentional participant in the robbery that foreseeably resulted in the killing of Mohammed (*see People v McLeod*, 168 AD2d 461 [1990], *lv denied* 77 NY2d 964 [1991]). Finally, the court properly denied defendant's request to charge the jury that in order to be found guilty, defendant must have formed the necessary mental culpability for robbery prior to the time that the coperpetrators committed the robbery. Defendant's request inaccurately precluded the possibility that defendant could have formed the requisite intent at the moment of the robbery (*see People v Patinos*, 249 AD2d 153 [1998], *lv denied* 92 NY2d 903 [1998]), and improperly implied that only the other perpetrators committed the robbery. In any event, the court's charge as given conveyed the proper standard (*see* Penal Law § 20.00; *People v Slacks*, 90 NY2d 850 [1997]; *People v Wood*, 299 AD2d 739, 740 [2002], *lv denied* 99 NY2d 621 [2003]).

Accordingly, the judgment of the Supreme Court, New York County (Leslie Crocker Snyder, J.), rendered April 20, 2000, convicting defendant, after a jury trial, of murder in the second degree and robbery in the first degree, and sentencing him to concurrent terms of 25 years to life and 12$\frac{1}{2}$ to 25 years, should be affirmed.

ANDRIAS, J. (dissenting). Because defendant was deprived of his constitutional right to confront his accuser and to present a defense when the trial court precluded cross-examination of the principal witness against him as to her motive to lie, I would reverse defendant's convictions and remand the matter for a new trial.

Defendant was convicted, after a jury trial, of the robbery and murder of Yousef Mohammed, a major heroin dealer from San Francisco, whose body was found shortly after midnight on January 23, 1996, wrapped in a carpet and dumped on Riverside Drive near West 164th Street in Upper Manhattan. Detective John Bourges was assigned to investigate the murder and, shortly thereafter, interviewed Xanderia Burnett at her apartment on West 173rd Street. At that time, Ms. Burnett never

mentioned that she or defendant were involved in any crime and it was not until a second interview more than two years later, in July 1998, when Detective Bourges told Ms. Burnett that defendant had accused her of the crime, that she inculpated defendant.

At trial, in April 2000, other than police and other forensic witnesses who testified to the effect that the victim had been shot once in the back of the head, as well as certain telephone records and other evidence purportedly linking defendant to Ms. Burnett's West 173rd Street apartment and to the victim, the prosecution's main witness, and the only one who placed defendant at the scene of the crime, was Ms. Burnett. Her involvement in the crimes was such that her possible status as an accomplice was given to the jury to decide as a factual matter.

Unquestionably, the testimony of Ms. Burnett, a 30-year-old resident of Washington Heights at the time of the crimes, who had previously been sentenced to five years' probation for weapons possession and whose husband was in prison serving time for selling drugs, was crucial to the People's case, and cross-examination as to any motive she might have had to falsely testify against defendant and fabricate her account of events was central to the defense.

As he did at trial, defendant now argues that he was deprived of his constitutional right to confront his accuser and to present a defense when the court improperly limited his counsel's cross-examination of Ms. Burnett by refusing to allow him to ask if Detective Bourges had told her that defendant had implicated her in the murder. Such a line of inquiry, the defense urges, went to Ms. Burnett's motive to fabricate her story regarding defendant's involvement in the crimes. Defendant also argues that this information was not hearsay, as it was not being offered for its truth. I agree.

The fact that the proffered cross-examination might have also allowed the defense to indirectly raise the issue of whether Ms. Burnett was the true murderer is of no importance. The questions sought not to establish the truth of Detective Bourges's statement to Ms. Burnett regarding defendant's accusation that she had killed Yousef, but were necessary to challenge the reason or motive for the People's central witness to identify defendant as the murderer after a two-year silence. Any prosecution concerns about the allegedly dual role of these questions would have been adequately dealt with by a simple, standard curative instruction, as suggested by the defense at trial, to the effect

that there was no evidence that defendant had actually made the accusation and that any questions posed to the witness as to what Detective Bourges told her before she accused defendant were being allowed not for their truth, but only as to their effect on her possible motive to lie.

At trial, Ms. Burnett testified on direct examination that she first met defendant when her mother, who died in 1991, dated him for about eight months, but she had not seen him for a long time. One Saturday night in January 1996, she left her four young children with her godmother and grandmother and, shortly after midnight, went to an after-hours club to meet a girlfriend who was the barmaid. While at the club, she was talking with her girlfriend about her husband being in jail, when she turned around and saw defendant, whom she knew as "Sweetpea." After they had conversed for about 25 minutes, defendant asked Ms. Burnett if she would like to make some money and she indicated that she was interested. Defendant told her that he needed to meet a friend and he would give her $1,500 if she would allow the meeting to take place in her apartment. Although she suspected that this meeting involved some type of drug transaction, she agreed. Defendant then introduced her to a man named "Moe." Before leaving the club, Ms. Burnett gave defendant her phone number and told him to call her when he was ready.

Shortly after Ms. Burnett arrived home about 6:15 A.M. Sunday morning, defendant called her and said he was coming up. When defendant arrived, he was with Moe and they had luggage with them. Ms. Burnett let them sleep on the couch because it had started to snow heavily and she went to sleep in her bedroom. When she woke up later that morning there was a heavy snowstorm and she called her grandmother and told her to keep the children because of the bad weather. Defendant told her that the man he was to meet would probably come after the snow stopped and the airports reopened. A few days after the snow cleared, defendant told her that his friend would be coming from San Francisco in a couple of days. At one point, Ms. Burnett saw defendant loading an automatic pistol with a silencer attached. She told defendant that he could not have a gun in her house because "I have kids in here" and he told her that he would get rid of it.

After about five days, when her oldest son came home from his grandmother's, defendant told Ms. Burnett that his friend was in town. Defendant, Moe, Ms. Burnett and her son then

drove to a small hotel in the Bowery/Chinatown area, where she was introduced to a man named Yousef. Ms. Burnett, her son and Moe watched television while defendant spoke to Yousef in the bedroom. As they drove back to her apartment, defendant assured her that she would receive her money the following day, and he would be out of her house.

A few days later, defendant woke Ms. Burnett and told her he was ready to do his business. She and Moe accompanied defendant down to the street, where she met a man, whom defendant introduced as "my man Farrow." They all then drove to Yousef's hotel where defendant went up and got Yousef, and they all drove back to the Ms. Burnett's apartment. Back at the apartment, Moe, Farrow and Yousef sat on the couch and defendant asked Ms. Burnett to go with him to see his parole officer.

When Ms. Burnett and defendant returned from visiting defendant's parole officer, Moe and Farrow were still there, but Yousef was gone. Ms. Burnett asked them where Yousef was but, before Moe or Farrow could answer, defendant asked if they got the key, and where was it. The three men then went into a rear bedroom (her son's room) and when defendant came out he told her to come with him to Yousef's hotel. On the way, defendant told her that he wanted her to carry some drugs, but she protested. Defendant told her to calm down and that she would get her money. At the hotel, defendant used a key to enter Yousef's room and, after rummaging around, he found 20 taped-up lunch-size brown paper bags which Ms. Burnett believed were drugs. They then returned to her apartment with the drugs.

Back at the apartment, Farrow, Moe and defendant had another meeting in the back room. When they came out, Ms. Burnett went back to use the bathroom and, on her way, passed her son's room. The door was slightly ajar, and she could see Yousef lying face down on the bed, with his hands behind his back, bleeding from his head. She ran back into the living room and asked what happened. Defendant told her to calm down or she would be dead too.

Farrow, Moe and defendant then divided the drugs among themselves and wrapped Yousef's body in a rug and bound it with tape. When it got dark, Ms. Burnett helped them put the body in a shopping cart and the men took it downstairs in the elevator, placing it in the trunk of Farrow's Volvo. Ms. Burnett was told to go back to her apartment and clean up all the blood. Although the men were gone for 45 minutes disposing of the

body, Ms. Burnett testified she did not call the police because she was afraid of what defendant and the others would do to her. After they returned to the apartment, Moe and Farrow left and she never saw them again; however, defendant stayed for several months.

The same day that Yousef was killed Ms. Burnett received several checks in the mail, made out to Yousef, but sent in care of her. She wrote "return to sender" on them and put them in the mail box.

Shortly thereafter, in late January 1996, Detective Bourges came to Ms. Burnett's apartment. Ms. Burnett, defendant and her son were in the apartment at the time. Before she opened the door, defendant told her that if she said anything he would "snap" her son's neck. Thus, when the detective asked her who else was in the apartment, she told the detective that defendant was there, but never mentioned the drug deal or the murder.

Although defendant was not always in the apartment with Ms. Burnett over the next few months, she did not call the police because she was afraid defendant would kill her or her family. While in the apartment, defendant gave her $2,000. In April 1996, defendant was arrested on a parole violation and, thereafter, in January 1997, when Ms. Burnett learned he was about to be released, she took her children, grandmother and younger brother and moved out of state. Ms. Burnett testified that, even after defendant went to jail on the parole violation and after she had moved out of state, she did not go to the police or call them because she was afraid of defendant and his two friends, who were still at large, and wanted to just get away from it all and put it behind her.

She then testified, still on direct examination, that Detective Bourges later contacted her by telephone at her out-of-state home and told her that he had some questions about the checks. He and another detective then visited her at her home and showed her some pictures, including one of defendant. The detective asked her if she recognized defendant and she said yes. After further conversation, she accompanied the detectives to a local police station where, after speaking with Detective Bourges for about two hours, she "filled out a statement" and then went home.

Although Ms. Burnett had inculpated defendant during that interview, the prosecution did not elicit that fact on direct examination or what prompted her to name him as the murderer at that point in time.

During his cross-examination of Ms. Burnett, defense counsel sought permission to question her about what Detective Bourges had told her during his visit to her out-of-state home about a purported statement made by defendant implicating her in the crime. Counsel's good-faith request was based upon testimony at a pretrial hearing to suppress defendant's statements and Ms. Burnett's identification of defendant from a photo array. The pretrial testimony established that in April 1998, more than two years after the crimes were committed, defendant had gone to the Drug Enforcement Agency (DEA) and spoken with a Detective Hom. Defendant offered to become a confidential informant about drug-related crimes in exchange for money and help locating Ms. Burnett, whom he described as his girlfriend, claiming that she had taken some jewelry and money from him and fled. Detective Hom told defendant to report the theft to his local precinct.

At a second meeting, about one week later, defendant returned to the DEA, giving Detective Hom information about various homicides and drug dealings, and telling him that a homicide had occurred in Ms. Burnett's apartment. Defendant claimed that he had been in the 173rd Street apartment with Ms. Burnett, her cousin and Yousef Mohammed. He left them for several hours to see his parole officer and when he returned he saw Mohammed's body lying on the floor. Mohammed had been "shot in the head and icepicked." He then said that Ms. Burnett and her cousin wrapped the body in a carpet and they all took the body downstairs in a shopping cart and dumped it behind a hospital on 168th Street.

Detective Hom relayed this information to Detective Bourges in May 1998 and, sometime in July 1998, the detective and his partner visited Ms. Burnett at her out-of-state residence. They asked her about the checks made out to Yousef Mohammed, which she had received and returned the day of the murder, and they showed her some photographs, including defendant's and Yousef's. Ms. Burnett said that she recognized defendant, but made no mention of the drug deal, the homicide, or the fact that defendant had stayed in her apartment for several months in 1996, and said that she did not recognize Yousef.

However, after Detective Bourges falsely told her that he had spoken to defendant and that defendant told him that she was responsible for the murder, Ms. Burnett broke down crying and told the detectives that defendant had in fact committed the homicide and that since then she had been running in fear for her

life. She then agreed to accompany the detectives to a local police station, where she gave a statement inculpating defendant and identified him from a photo array. Later, in October 1998, Detective Bourges again visited Ms. Burnett and showed her three photographs. One she identified as a picture of the rug in which Yousef's body had been wrapped; the other two were of Farrow and Moe, both of whom she identified.

The defense informed the court that, on cross-examination, it wished to use the information that Ms. Burnett only implicated defendant after the detective, admittedly falsely, told her that defendant had implicated her in the murder to demonstrate a possible motive for Ms. Burnett to fabricate, in that she was trying to deflect guilt from herself onto her accuser, the defendant. Such request was denied, the court ruling that it was inappropriate for the defense to "[i]ntroduce into evidence . . . by way of a question, something you are seeking to have the jury speculate, draw an inference because I'm not at all sure it is accurate." The court would not allow the defense to introduce defendant's "self-serving," "unreliable" accusations without the defendant being subject to cross-examination.

The court would permit defense counsel to place before the jury evidence that Ms. Burnett had committed the crime, but not through what it described as defendant's self-serving hearsay. The court stated that it would also permit the defense to ask if Detective Bourges had himself accused Ms. Burnett of the crime, if there was a good-faith basis for such question, but defense counsel stated that he did not have such a basis. Thus, the court only permitted the defense to ask Ms. Burnett if Detective Bourges had made "certain statements" to her prior to her breaking down, but not the substance of what was said, and stated that it would permit counsel to inquire into any other subject regarding Detective Bourges's interview with the witness for which he had a good-faith basis.

When defense counsel resumed cross-examining Ms. Burnett, he tried to elicit what Detective Bourges had told her about defendant's accusation and that Detective Bourges indicated that defendant had told him "that it was you." The court sustained an objection by the prosecutor and instructed the jury:

> "Mr. Klein [defense counsel] is not allowed to put before you information that may or may not be reliable, that cannot be tested in court.

"And you are to disregard that last question totally. Give it no credence.

"The question that is to be allowed is: Did Detective Bourges then ask you certain questions after he told you what the defendant had purportedly said?"

Ms. Burnett then indicated that she broke down after Detective Bourges had confronted her with "information."

Later, the defense sought to ask Detective Bourges what he had told the witness about defendant's purported accusation. The court again would not allow such inquiry. Counsel then moved for a mistrial, which was denied.

Thereafter, counsel prepared a memorandum of law, again seeking to elicit that Detective Bourges had told the witness that defendant had accused her of the crime in order to establish a possible motive for Ms. Burnett to fabricate her response in order to shift the blame to her purported accuser. The defense argued that such testimony was not hearsay because it was not being offered for its truth as proof that any such accusation was made by defendant, but only as to possible bias or motive to fabricate on the part of the prosecution's main witness. The court again, in my opinion improperly, denied such request.

> "The motive to lie about the very facts surrounding the crime charged is never collateral . . . 'It is well established that the trial courts have broad discretion to keep the proceedings within manageable limits and to curtail exploration of collateral matters . . . However, extrinsic proof tending to establish a reason to fabricate is never collateral and may not be excluded on that ground . . . Further, the trial court's discretion in this area is circumscribed by the defendant's constitutional rights to present a defense and confront his accusers'. 'Where the right to cross-examine has been significantly curtailed, reversal will be required even without a showing of specific prejudice.' " (*People v Rios*, 223 AD2d 390, 391-392 [1996], quoting *People v Hudy*, 73 NY2d 40, 56-57 [1988] and *People v Carter*, 86 AD2d 451, 458 [1982], and citing *People v Ashner*, 190 AD2d 238, 246 [1993].)

The People argue that defendant's out-of-court accusation that the witness committed the crime was clearly being offered for its truth. They contend that, as the trial court repeatedly told defense counsel, he could show that the witness had a mo-

tive to lie because she committed the crime, he just could not do so by using defendant's own self-serving hearsay accusation that was not subject to cross-examination.

This argument misses the point. Any out-of-court statement used to confront a witness raises possible evidentiary problems, including hearsay concerns. Here, however, where defense counsel sought to use defendant's accusation to question Ms. Burnett as to why she inculpated defendant at that point, the issue is not whether defendant actually said it, but whether the detective's statement to Ms. Burnett that defendant made such an accusation caused her to break her more than two-year silence and falsely accuse defendant.

The People contend that, even if some nonhearsay purpose could be offered for asking the precluded question, the trial court was well within the bounds of its discretion to preclude it on the basis that its probative value was outweighed by the risks that it would prejudice the People and mislead the jury because the jury would have heard defendant's accusation without the People having a chance to cross-examine him about it (citing *People v Torres*, 289 AD2d 136 [2001], *lv denied* 97 NY2d 762 [2002]; *People v Williams*, 251 AD2d 93 [1998]; *People v Walker*, 250 AD2d 371 [1998], *lv denied* 92 NY2d 862 [1998]). They further argue that notwithstanding defendant's suggested curative instruction (that "there was no evidence that defendant had actually made the accusation"), the court properly limited cross-examination on that point because it did not want the jury to speculate that it was, in fact, defendant's accusation.

However, unlike the cases relied upon by the People, which are readily distinguishable on their facts, the effect of Detective Bourges's confrontation of Ms. Burnett with defendant's purported accusation was clearly relevant to the issue of her motive to fabricate evidence against defendant, whether to divert attention from her admitted participation in the crimes, or in revenge for defendant allegedly implicating her.

Taking out of context some of defense counsel's statements during the lengthy colloquy on the subject, the People argue that his real purpose was to introduce defendant's accusation for its truth and, therefore, it was properly excluded as inadmissible hearsay. However, the fact that the proffered cross-examination might have also allowed the defense to indirectly raise the issue of whether Ms. Burnett was the actual murderer is of no importance. A fair reading of the 38-page colloquy on the issue leads to the inescapable conclusion that the questions

sought to be asked were not intended to establish the truth of Detective Bourges's statement to Ms. Burnett regarding defendant's accusation, but were necessary to probe the People's central witness's reason or motive for identifying defendant as the murderer after a two-year silence.

As defense counsel stated: "It is fundamental to the case. She is the critical witness. I'm not doing it merely to impeach her credibility, but I'm doing it primarily because it is her motive to lie in the case. We have said from the beginning it is our position that she lied because she did it. It is also our position she lied about it because she was accused at this moment by Bourges of doing it." Counsel further stated that it was important that the jury know that Detective Bourges had said that it was the defendant who made the accusation because it gave Ms. Burnett "more of a motive to lie," because she "knows [defendant] is the individual who was there, and saw her do it." The defense was not averse to an instruction informing the jury that there was no evidence that defendant had actually made such an accusation, but that it was important, on both state and federal constitutional grounds, that the defense be permitted to explore this possible motive for the witness to fabricate defendant's involvement.

Detective Bourges's statement was concededly false to the extent he said that *he* had interviewed defendant. However, whether or not defendant had actually accused the witness of the murder was irrelevant for the proposed purpose of the cross-examination. What was important to bring out was that for more than two years, the witness never contacted the police or inculpated defendant until after she was told, truthfully or not, that he had accused her. While we can only speculate as to whether the jury, "as sole judge of the credibility of a witness," would have accepted the defense's line of reasoning, it was certainly entitled to have the benefit of the defense's theory of her bias before it so that it could make an informed judgment as to the weight to place on the witness's testimony (*Davis v Alaska*, 415 US 308, 317 [1974]).

Finally, the People urge, and the majority agrees, that any error in precluding the proffered cross-examination was harmless because defendant had ample opportunity to attack the credibility of Ms. Burnett's testimony. Thus, it is urged, questions that went to additional attempts to impeach her testimony could not have affected the outcome of the trial in light of supposedly overwhelming evidence of defendant's guilt. However, such sup-

posedly overwhelming evidence is primarily based upon Ms. Burnett's self-serving account of events, which provides an even stronger reason to permit the defense to question her motives for testifying against him.

Given that Ms. Burnett was the People's primary fact witness, it cannot be said that, if defendant were able, on cross-examination, to establish her motive to lie, there was no reasonable possibility that a reasonable jury would have acquitted defendant. Ms. Burnett was the only one who placed defendant with a gun in her apartment and connected him with the robbery and murder and the disposal of the body. But, as previously noted, because it is undisputed that she was aware of and facilitated the drug deal, the murder occurred in her apartment, she admitted that she was present shortly after the fatal shot, and, she also admitted that she helped clean up and dispose of the body, the trial court agreed that it was for the jury to determine whether she was an accomplice to the crimes. While the majority opines that the defense did not need such line of inquiry to argue to the jury in summation that Ms. Burnett was the actual murderer, the possibility that such argument might otherwise be available should not have precluded the defense from asking this key prosecution witness why she suddenly ended her two-year silence and accused defendant despite having had ample prior opportunity to do so. To force the defense to question Ms. Burnett's motive to lie indirectly, without allowing it to ask the key question as to what made her change her mind, eviscerated the defense's cross-examination of this crucial witness and turned defendant's constitutional right to confront his accuser on its head.

Although the Confrontation Clause of the Sixth Amendment does not prevent trial judges from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness, the wide latitude they retain to impose reasonable limits on such cross-examination must be based upon legitimate concerns about, "among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant" (*Delaware v Van Arsdall*, 475 US 673, 679 [1986]).

> "While some constitutional claims by their nature require a showing of prejudice with respect to the trial as a whole, the focus of the Confrontation Clause is on individual witnesses. Accordingly, the focus of the prejudice inquiry in determining

whether the confrontation right has been violated must be on the particular witness, not on the outcome of the entire trial. It would be a contradiction in terms to conclude that a defendant denied any opportunity to cross-examine the witnesses against him nonetheless had been afforded his right to 'confront[ation]' because use of that right would not have affected the jury's verdict. We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness' " (*id.* at 680 [citations omitted]).

Clearly, the proffered cross-examination could not reasonably be construed as raising concerns of harassment, prejudice, confusion of the issues or any other legitimate concern. Thus, by precluding inquiry into the possibility that Ms. Burnett might be biased against defendant as a result of Detective Bourges' statement to her that defendant had accused her of the murder, an event that the prosecution does not deny and which a jury might reasonably have found furnished Ms. Burnett with a motive to falsely testify against defendant, the trial court's ruling violated defendant's right guaranteed by the Confrontation Clause (*id.* at 679).

Accordingly, defendant's convictions should be reversed and vacated and the matter remanded for a new trial.

Tom, J.P., Lerner and Marlow, JJ., concur with Friedman, J.; Andrias, J., dissents in a separate opinion.

Judgment, Supreme Court, New York County, rendered April 20, 2000, affirmed.